[Cite as *State v. Garrett*, 2019-Ohio-750.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


| | | |
|---|---|---|
| STATE OF OHIO, | : | CASE NO. CA2018-03-048 |
| Appellee, | : | O P I N I O N<br>3/4/2019 |
| | : | |
| - vs - | : | |
| | : | |
| LATISHA H. GARRETT, | : | |
| Appellant. | : | |


CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2017-11-1863


Michael T. Gmoser, Butler County Prosecuting Attorney, John C. Heinkel, Government Services Center, 315 High Street, 11th Floor, Hamilton, OH 45011, for appellee

Scott N. Blauvelt, 315 South Monument Avenue, Hamilton, OH 45011, for appellant


**M. POWELL, J.**

{¶ 1} Defendant-appellant, Latisha H. Garrett, appeals her 18-month prison sentence in the Butler County Court of Common Pleas for telecommunications fraud and theft from a person in a protected class.

{¶ 2} Garrett was indicted for telecommunications fraud, theft from a person in a protected class, and identity fraud against a person in a protected class. The charges arose from a scheme devised and executed by Garrett and her boyfriend, Eric Kleinholz, to

swindle $4,800 from the victim.

{¶ 3} The victim is a 105-year old woman residing at The Knolls in Oxford, Ohio. Garrett was employed by Visiting Angels as a "caregiver." Pursuant to this employment, the victim was one of Garrett's clients. On or about July 6 or 7, 2017, Kleinholz placed a telephone call to the victim. Kleinholz, acting with information provided to him by Garrett, identified himself to the victim as Kelvin Small, the victim's grandson. Posing as Small, Kleinholz told the victim that he was in Dayton, Ohio to give a speech where his car had broken down. Kleinholz claimed that he had left his billfold on the dining room table in Tennessee and that he needed $4,800 to complete necessary vehicle repairs. The victim agreed to get the money and had Garrett take her to the bank. The victim withdrew $4,800 from her bank account and returned home. The money was placed into an envelope and given to Garrett to take to the victim's grandson in Dayton. Garrett left the victim's home with Kleinholz in Kleinholz's vehicle. The pair removed the money from the envelope and placed the torn envelope in a post office mailbox in Oxford.

{¶ 4} Pursuant to plea negotiations, Garrett entered guilty pleas to telecommunications fraud, in violation of R.C. 2913.05(A), and theft from a person in a protected class, in violation of R.C. 2913.02(A)(3), both fourth-degree felonies. The charge of identity fraud against a person in a protected class was dismissed. The trial court ordered a presentence-investigative report ("PSI") and scheduled sentencing.

{¶ 5} Prior to the sentencing hearing, the state and Garrett both filed sentencing memoranda. Garrett argued that she should be sentenced to community control pursuant to R.C. 2929.13(B)(1)(a) because she was being sentenced for fourth-degree felonies, she had no prior convictions for felonies or for misdemeanor offenses of violence, and the trial court had not requested the department of rehabilitation and correction to provide information for available community control sanctions. The state argued that the trial court

had discretion to impose a prison term pursuant to R.C. 2929.13(B)(1)(b)(viii) because Garrett's position as the victim's "caregiver" was a "position of trust" which facilitated her commission of the offenses.

{¶ 6} At the sentencing hearing, the trial court heard from Garrett and the state and confirmed its consideration of the PSI, the victim impact statement, both sentencing memoranda, the R.C. 2929.11 purposes and principles of sentencing, and the R.C. 2929.12 seriousness and recidivism factors. Based upon the foregoing, the trial court acknowledged Garrett's prior record, consisting of a single disorderly conduct conviction, and expressed dismay at Garrett's minimization of her role in the offenses and apparent lack of genuine remorse for what she had done. The trial court noted Garrett's position as the victim's "caregiver" and found that Garrett "held a position of trust * * * that facilitated" the offenses. The trial court imposed 18-month prison terms on each of the offenses and ordered that the prison terms be served concurrently.

{¶ 7} Garrett now appeals, raising one assignment of error:

{¶ 8} THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY IMPOSING A PRISON TERM IN VIOLATION OF R.C. 2929.13(B)(1)(a).

{¶ 9} Garrett argues that the trial court erred in sentencing her to a prison term because the record does not support the trial court's finding that she held a "position of trust" as the victim's caregiver, which facilitated the commission of the offenses.

{¶ 10} We review the imposed sentence under the standard of review set forth in R.C. 2953.08(G)(2), which governs all felony sentences. *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, ¶ 1. Pursuant to that statute, an appellate court does not review the sentencing court's decision for an abuse of discretion. *Id.* at ¶ 10. Rather, R.C. 2953.08(G)(2) compels an appellate court to modify or vacate a sentence only if the appellate court finds by clear and convincing evidence that "the record does not support the

trial court's findings under relevant statutes or that the sentence is otherwise contrary to law." *Id.* at ¶ 1. A sentence is not clearly and convincingly contrary to law where the trial court "considers the principles and purposes of R.C. 2929.11, as well as the factors listed in R.C. 2929.12, properly imposes postrelease control, and sentences the defendant within the permissible statutory range." *State v. Aburas*, 12th Dist. Clermont No. CA2017-10-054, 2018-Ohio-1984, ¶ 9.

{¶ 11} R.C. 2929.13(B) generally requires a sentencing court to impose a community control sanction or sanctions as the sentence for a fourth-degree felony. However, R.C. 2929.13(B)(1)(b)(viii) grants a sentencing court discretion to impose a prison term as a sentence for a fourth-degree felony if "[t]he offender held a public office or position of trust, and the offense related to that office or position; the offender's position obliged the offender to prevent the offense or to bring those committing it to justice; or the offender's professional reputation or position facilitated the offense or was likely to influence the future conduct of others." R.C. 2929.13(B) is one of the "relevant statutes" referenced in R.C. 2953.08(G)(2). Thus, to withstand an appeal, a sentencing court's finding that an offender held a "position of trust" under R.C. 2929.13(B)(1)(b)(viii) must be supported by the record. The statute does not specify how the record is to be developed in this regard. We do not interpret the statute as requiring judicial fact finding, as suggested by the dissent. We merely observe that R.C. 2953.08(G)(2) requires a finding that an offender occupied a "position of trust" in relation to the offense be supported by the record. The parties and the sentencing court may utilize any proper method to develop the record to fulfill that requirement.

{¶ 12} In 2010, the Ohio Supreme Court considered whether the phrase "position of trust" as used in R.C. 2929.13(B)(1)(d), a predecessor version of the current statute, applied only to public officials and public servants or also to private individuals, such as Garrett. *State v. Massien*, 125 Ohio St.3d 204, 2010-Ohio-1864. *Massien* involved a nurse who

- 4 -

was charged with fourth-degree felony theft of drugs from her employer hospital. The state maintained that the nurse held a "position of trust" with her employer hospital and was thus ineligible for intervention in lieu of conviction. The supreme court ultimately determined that the nurse did not hold a "position of trust." However, the supreme court further held, "Although a 'position of trust' for the purpose of [the statute] is not limited to public officials and public servants, it does not include all positions of trust held by a private individual. Rather, a private individual holds a 'position of trust' if he or she occupies a special relationship of trust and confidence equivalent to a fiduciary relationship." *Massien* at ¶ 41.

{¶ 13} The supreme court observed that "the General Assembly intended a narrow application of the phrase 'position of trust.'" *Id.* at ¶ 22. As the supreme court explained, "[W]e do not believe that the legislature intended the phrase to apply to all individuals who breach any private expectation of trust." *Id.* at ¶ 21. "An unrestrained application of the phrase 'position of trust' to 'every breach of ethical, moral, or filial duty by a private individual' is not consistent with the sentencing principles set forth by the General Assembly, * * * or with the language of R.C. 2929.13(B)(1) as a whole." (Citation omitted.) *Id.* Thus, the supreme court recognized that while a private individual may hold a "position of trust" under the common, everyday understanding of the phrase, a different meaning is intended by the statute.

{¶ 14} The supreme court then held that if a private individual is to be considered as holding a "position of trust," as the phrase is intended by the statute, then that person must occupy "a special relationship of trust and confidence equivalent to a fiduciary relationship." *Massien*, 2010-Ohio-1864 at ¶ 41. "A 'fiduciary relationship' is one in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust." *Id.* at ¶ 35. "A 'fiduciary' has been defined as 'a person having a duty, created by his undertaking, to act

- 5 -

*primarily for the benefit of another* in matters connected with his undertaking.'" (Emphasis sic.) *Id.*

{¶ 15} Furthermore, "'emphasis should be placed upon whether the assigned job duties require, as essential qualifications over and above technical competency requirements, a high degree of trust, confidence, reliance, integrity and fidelity.'" *Id.* at ¶ 37, quoting *State ex rel. Charlton v. Corrigan*, 36 Ohio St.3d 68, 71 (1988). "Job duties that require a great degree of discretion support the existence of a fiduciary relationship, whereas assigned duties of a routine character do not involve the degree of discretion or trust necessary to be considered a fiduciary." *Massien* at ¶ 37. "A further consideration involves whether the employee's responsibility includes 'daily discretionary decisions' affecting persons served by the employer that require the employee to be 'of higher than normal reliability.'" *Id.*, quoting *Charlton* at 73.

{¶ 16} Noting the varying treatment of the issue by Ohio appellate courts, the supreme court rejected the broad approach taken by "a number of appellate courts [that] have held that virtually any public or private individual whose offense relates to a breach of any trust occupies a 'position of trust' for the purpose of [the statute]," in favor of the approach taken by the First Appellate District. The supreme court observed, "'Consistent with the purposes and principles of felony sentencing, * * * the phrase 'position of trust' under [the statute] applies only to private individuals in professions 'traditionally thought to invoke a special relationship of trust - such as a doctor, lawyer or accountant.'" *Massien*, 2010-Ohio-1864 at ¶ 16, quoting *State v. Condon*, 152 Ohio App.3d 629, 2003-Ohio-2335, ¶ 104 (1st Dist.).

{¶ 17} In applying *Massien*, the Second Appellate District determined that a used-car dealership office manager who functioned much like an accountant and had embezzled funds from the dealership was in a "position of trust" by occupying a "fiduciary relationship"

with the dealership. *State v. Courtney*, 2d Dist. Clark No. 2013-CA-73, 2014-Ohio-1659, ¶ 24. Upon being denied community control and sentenced to a prison term for her theft, Courtney appealed and argued that she did not occupy a "position of trust" and was entitled to community control under the current version of the statute. In affirming the trial court and finding that Courtney did occupy a "position of trust," the Second Appellate District noted that Courtney was a 20-year employee of the dealership with job duties that included supervision of customer accounts, tracking the dealerships accounts and expenses, handling large sums of money, and making bank deposits. Based upon the foregoing, the appellate court held

> The record establishes that Courtney was in a position that required higher than normal reliability. Her responsibilities and access to large sums of money required a high degree of discretion and trust from her former employer, which translates to a fiduciary relationship. Because of the employer's trust and reliance upon her in handling its money, Courtney was able to steal $44,726. Accordingly, the record establishes that she was in a "position of trust" as contemplated under R.C. 2929.13(B)(1)(b)(viii).

*Id.*

{¶ 18} The state cites our opinion in *State v. Sanders*, 12th Dist. Butler No. CA2003-12-311, 2004-Ohio-6320, and the Fifth Appellate District's opinion in *State v. Lehman*, 5th Dist. Fairfield No. 01CA12, 2001 Ohio App. LEXIS 6030 (Dec. 12, 2001), in support of its argument that Garrett occupied a "position of trust" in her relationship to the victim. Both cases are pre-*Massien* and did not have the benefit of its analysis in determining whether the respective defendants in those cases occupied "positions of trust."

{¶ 19} *Sanders* involved a caregiver employed by a residential care facility for the mentally handicapped. Sanders was charged with patient abuse, a fourth-degree felony, and assault, a first-degree misdemeanor, for physically abusing a mentally handicapped resident of the facility. Sanders was convicted as charged and sentenced to a prison term

upon a finding that she occupied a "position of trust." Sanders appealed, arguing that she

should have been sentenced to community control. We affirmed the prison term, holding

> With regard to the trial court's finding that appellant held a position of trust, we find that the record supports the finding. Terry was a mentally handicapped patient with limited communication skills who resided in the center where appellant was employed as a caregiver. Appellant worked for a facility that was supposed to provide care, comfort, and security to Terry. Appellant's position as a caregiver at the center, regardless of whether Terry was her patient that day, therefore placed her in a position of trust.

*Id.* at ¶ 18.

{¶ 20} Although we decline to overrule *Sanders*, its prospective efficacy is limited by

the guidance of *Massien*, wherein the supreme court recognized limitations upon the

application of the phrase "position of trust" to private individuals who may be in positions of

trust that are not akin to fiduciaries in relation to the offense with which they are charged.

{¶ 21} *Lehman* is factually similar to this case in that it involved theft of money from

an elderly person for which Lehman was a caregiver. The Fifth Appellate District held, "The

record indicates that appellant was a home health care giver for a woman in her eighties

who was suffering from dementia when the offenses in question were committed. We find

that such a position places a person in a position of trust and facilitated the offense."

*Lehman*, 2001 Ohio App. LEXIS 6030 at *19.

{¶ 22} Again, *Lehman* must be considered with some caution, as it predates the

supreme court's guidance in *Massien*.

{¶ 23} The record reflects that Garrett was a 34-year-old, high school-educated

employee of Visiting Angels earning $12 an hour. Garrett's job title was "caregiver." The

record further reflects that Garrett was scheduled to be in the victim's home for two hours

on the day of the offense. Presumably, Garrett performed in-home services for her clients.

Although Garrett reported in the PSI that she generally "had been taking her clients to the

bank for the duration" of her employment with Visiting Angels, the record reflects that she took the victim to the bank only on the single occasion of this offense. The victim impact statement contains a brief description of the bank's surveillance video depicting Garrett and the victim at the bank's teller window when the victim withdrew the funds from her bank account.[1] Garrett's job duties are not otherwise defined in the record.

{¶ 24} "Caregiver" is a generic job title. In this sense, this job title may encompass such a broad range of responsibilities that the title is practically useless in conveying the responsibilities of a particular person dubbed a "caregiver." To overcome this, the dissent cites a legal treatise definition of "caregiver" and hypothesizes about the various duties which might come under the "caregiver" title. Based upon this construct, the dissent asserts that it is reasonable for the trial court to have inferred that Garrett's duties and this hypothetical "caregiver's" responsibilities were identical. The established facts in the record do not support such an inference. It is not logical to deduce from Garrett's job title and the information concerning her responsibilities that she performed the same duties as the dissent's hypothetical "caregiver."[2] Specifically, this record does not support an inference that Garrett's duties as a "caregiver" involved that great degree of discretion necessary to support the existence of a fiduciary relationship as opposed to duties of a routine character not involving the degree of discretion or trust necessary for her to be considered a fiduciary.[3] On the contrary, Garrett's lack of higher education and her relatively low wages infer that

---

1. The video itself was not admitted into evidence and is not part of the record for our review.

2. "An inference is a permissible deduction which the jury may make from a set of facts that can be deduced by the ordinary principles of logic." *State v. McFadden*, 7 Ohio App.3d 215, 216-217 (12th Dist.1982), citing *State v. McCarthy*, 20 Ohio App.2d 275, 285 (1969). In other words, an inference must logically follow from facts established in the record.

3. The dissent implies that there is some distinction between a "fiduciary" relationship and one "equivalent" to a fiduciary relationship as referred to in *Massien*. The word "equivalent" means "like in signification or import." *Webster's Third New International Dictionary* 769 (1986); *State v. Lloyd*, 132 Ohio St.3d 135, 2012-Ohio-2015, ¶ 28.

her job duties were of a routine character, likely consisting of some combination of common household chores such as meal preparation, cleaning, laundry, bathing, and clothing the victim. The supreme court cautioned in *Massien* that "technical competence" to perform tasks should not be confused with that "high degree of trust, confidence, reliance, integrity and fidelity" required of a fiduciary. *Massien*, 2010-Ohio-1864 at ¶ 37.

{¶ 25} Garrett and Kleinholz tricked the victim into believing that she was confronted with an emergency where her grandson, who lives in Tennessee, was stranded in Dayton, Ohio with a broken-down car and needed money to complete the necessary repairs. Under those circumstances, the victim "trusted" Garrett to deliver the money to the victim's grandson, as the most expeditious manner to resolve the apparent emergency. Garrett had an ethical, moral, and filial duty not to betray that trust and take advantage of this vulnerable victim. *Massien* made clear that merely trusting a person does not place that person in a "position of trust." Specifically, "every breach of ethical, moral, or filial duty by a private individual" does not elevate an offender to a "position of trust" in relation to the offense. *Massien* at ¶ 21. Based upon this record, if Garrett occupied a "position of trust," it was within the colloquial sense of the phrase which the supreme court in *Massien* excluded from the ambit of the statute. *Id.* at ¶ 41.

{¶ 26} The dissent makes an emotional appeal to resolve the issue of whether Garrett occupied a "position of trust" based upon the wicked nature of Garrett's exploitation of a vulnerable victim. Specifically, the victim was of an advanced age and apparently suffered from some decline in mental function. However, the R.C. 2929.13(B)(1)(b)(viii) "position of trust" factor is concerned not with whether the victim's vulnerability facilitated the offense, but with whether the offender's fiduciary duties facilitated the offense.[4] Most

---

4. The General Assembly has not included a victim's vulnerability as a circumstance authorizing a trial court to impose a prison term for a conviction of a fourth-degree felony in R.C. 2929.13(B)(1)(b).

would agree that Garrett's conduct was heinous, provokes outrage, and arouses a passion for retribution. However, outrage and passion do not supply the "position of trust" factor or lessen the requirement of R.C. 2953.08(G)(2) that the record support the trial court's finding that Garrett occupied a "position of trust" as the General Assembly used the phrase in R.C. 2929.13(B)(1)(b)(viii).

{¶ 27} The dissent subtlety distorts the record to support its position that Garrett occupied a "position of trust." First, to enhance Garrett's stature, the dissent refers to her as a "professional" caregiver. We have searched the indictment, the bill of particulars, the transcripts of the plea and sentencing hearings, the parties' sentencing memoranda, the PSI, the victim impact statement, and the sentencing entry and find no reference to Garrett as a "professional." There is nothing else in the record from which to conclude that Garrett was a "professional." Garrett was a high school-educated "caregiver" earning $12 an hour, which suggests that Garrett lacked the requisite education, training, and skill to be considered a "professional."

{¶ 28} The dissent embellishes the degree of the victim's dependence upon Garrett. For example, the dissent refers to the victim as a "ward," even though there is no indication that the victim was adjudged incompetent or is subject to a guardianship. According to the PSI and the victim impact statement, Visiting Angels and Garrett referred to persons served by Visiting Angels' caregivers as "clients," not "wards." The dissent asserts that the reference to the victim as a "ward" is in the everyday sense of the word because the record demonstrates that the victim was under the "guard, protection, or supervision" of Garrett. On the contrary, given that Garrett was scheduled to be in the victim's home for just two hours on the day of the offense, it is more logical to deduce that Garrett was intermittently in the victim's home for brief periods of time than that the victim was under the "guard, protection, or supervision" of Garrett.

{¶ 29} The dissent also insinuates that the victim is debilitated by Alzheimer's disease based only upon an out-of-state relative's report in the victim impact statement of his understanding that the victim had a "diagnosis of early onset Alzheimer's disease." However, the extent of the victim's affliction from Alzheimer's disease cannot be gleaned from the record and was not significant enough to merit mention in the PSI, or by either the trial court or the prosecutor during the plea or sentencing hearings. In fact, with the exception of the one reference in the victim impact statement, there is no mention of the victim suffering from Alzheimer's disease anywhere in the record. Furthermore, in its brief, the state does not allude to the victim suffering from Alzheimer's disease, much less argue that Alzheimer's disease is a factor in analyzing whether Garrett occupied a "position of trust." Yet, based upon this single mention in the victim impact statement, the dissent refers to the victim as suffering from Alzheimer's disease no less than nine times.

{¶ 30} Finally, the dissent seeks to diminish the holding of *Massien* by repeatedly invoking the victim's age and frailty as the source of a "special relationship" between Garrett and the victim. In doing so however, the dissent ignores the qualification in *Massien* that the "special relationship" be equivalent to a "fiduciary relationship" akin to that between a person and their "doctor, lawyer or accountant." *Massien*, 2010-Ohio-1864 at ¶ 2, 16. In summary, the narrative created by the dissent is one based upon exaggeration of the facts, minimization of the law, and appeal to emotion as opposed to being based on the record.

{¶ 31} We hold that the record clearly and convincingly does not support the trial court's finding that Garrett occupied a "position of trust" under R.C. 2929.13(B)(1)(b)(viii). The trial court's finding that Garrett occupied a "position of trust" is accordingly reversed, the sentence is vacated, and the matter is remanded to the trial court for resentencing pursuant to R.C. 2953.08(G)(2). Upon remand, the trial court shall comply with R.C. 2929.19(A) which requires the trial court, on a remand for resentencing, to conduct a

sentencing hearing at which "the offender, the prosecuting attorney, [and] the victim or the victim's representative * * * may present information relative to the imposition of sentence in the case." Garrett's assignment of error is sustained.

{¶ 32} Judgment reversed.

RINGLAND, P.J., concurs.

PIPER, J., dissents.


**PIPER, J., dissenting.**

{¶ 33} Respectfully, I dissent because the majority inadvertently, but nevertheless inappropriately, substitutes its judgment for that of the trial court. The trial court found that a "position of trust" applies in sentencing Garrett, which makes a sanction of prison a possible consideration. R.C. 2929.13(B)(1)(b)(viii). Conversely, the majority re-evaluates the information within the record, draws its own inferences, and holds that the trial court's finding of a "position of trust" is not logical or otherwise supported by the record. R.C. 2953.08(G)(2).

{¶ 34} In order to vacate the trial court's finding and render judgment for a new sentence with a full "do-over" hearing, the majority (1) misapplies the "extremely deferential" standard of review found in R.C. 2953.08(G)(2), and subtlety imposes an obligation upon the trial court to develop a record, (2) develops an overly-stringent interpretation of *State v. Massien*, 125 Ohio St.3d 204, 2010-Ohio-1864, which then implicitly requires fact finding, and (3) abandons the doctrine of *stare decisis* in failing to follow Twelfth District precedent without overruling it.

{¶ 35} Before I share my viewpoints, let me say, I do not share the majority's sentiment of "outrage" or "passion for retribution." Nor do I consider Garrett's conduct to be "heinous" or "wicked." I would reserve such adjectives for far worse crimes. Any appeal

my words aim to provoke is for a commonsensical application of the facts to the law. [5]

**Standard of Review**

{¶ 36} The majority perceives the record and draws inferences significantly different than the trial court's perception and use of inferences. This difference does not mean the trial court is necessarily wrong or unreasonable. R.C. 2953.08(G)(2) does not permit vacating a trial court's sentencing decision just because "this court may not have reached the same decision." *State v. Belcher*, 12th Dist. Warren No. 2016-12-102, 2017-Ohio-6943, ¶33.

{¶ 37} R.C. 2929.13(B)(1)(b) grants discretion to consider a term of prison once the trial court makes a finding. The trial court at that point is not obligated to provide community control, but rather may consider a sanction of prison. While the majority devotes discussion to Garrett's station in life, it gives little significance to the elderly victim's physical and mental condition and the nature of the relationship created when Garrett has hired to take care of the victim. It trivializes the role of an elderly in-home caregiver as routine in character and attempts to nullify the information available to the trial court.[6]

{¶ 38} R.C. 2953.08 presents an even more restrictive standard of appellate review than the abuse of discretion standard because it is an "extremely deferential" standard of review where the "restriction is on the appellate court, not the trial judge." *State v. Geldrich*, 12th Dist. Warren No. CA2015-11-103, 2016-Ohio-3400, ¶6. Thus, R.C.2953.08(B)(2) prohibits reversing a trial court's sentence simply because of different weight, or significance, attributed to the record. Struggling with evaluating the amount of information

---

5. The majority's use of adjectives in an effort to undermine the dissenting viewpoint derives from the majority's difficulty in defending a substitution of its finding that the record does not support a "position of trust" for sentencing purposes in place of the trial court's finding that the record does support such a finding. The emphasis upon facts, words within their everyday meaning, and the significance of the nature of the relationship, is not intended to be "emotional" but rather intended to provide a more complete perspective, which in my opinion, is absent in the majority opinion.

6. For example, the majority reduces Garrett's caregiver status as just a "generic job title."

available, the majority determines it would like more information. After attempting to nullify any reasonable inferences made by the trial court, the majority then advocates that a "position of trust" finding is not supported by the record.

{¶ 39} The majority rebukes the unintended consequence of its decision as requiring fact finding. Yet, in its remand instructions, it invites the state to present information necessary to satisfy the majority's analysis and invites the defense to refute any information provided. In the majority's perception, knowing the victim's rarely achieved age and that she had Alzheimer's is insufficient; also of little significance to the majority is knowing that Garrett was specifically hired for the purpose of taking care of the victim. The majority suggests that the record must support duties exhibiting a great degree of sophistication or discretion and that "Garrett's job duties are not otherwise defined in the record." Finally, the majority informs the trial court "to utilize any proper method to develop the record* * *." Yet, there is no statutory authorization for a trial court to develop the record. The majority's analysis continually informs the parties and court regarding the type of information the majority considers necessary to survive its appellate review. However, neither R.C. 2929.13(B)(1)(b), R.C2953.08(G)(2), nor *Massein* requires such fact finding. The consequences of the majority's analysis exists, whether intended or not.

{¶ 40} The trial court can accept Garrett's admission of guilt, examine the indictment and filings, consider the presentence investigation report, the victim impact statement, as well as the statements at sentencing, for its consideration in determining if the position was one of trust for purposes of R.C. 2929.13 (B)(1)(b)(viii). All of which the trial court referenced. The trial court can make reasonable inferences as to the special relationship Garrett's position was to a physically frail and mentally vulnerable woman at the extremely rare, advanced age of 105; compounded to some degree with an infliction of the known cognitive debilitating disease of Alzheimer's.

{¶ 41} The depth of responsibilities for providing protective services for a person with Alzheimer's, at any stage, is not routine in character as the majority suggests. Similarly, the depth of responsibilities for an in-home caregiver supervising the well-being of a rare and fragile centenarian is not beyond the common knowledge possessed by most people. The special relationship between the one in charge of giving care, and the one subject to receiving care, is also commonly understood by most people as inherently grounded in a fiduciary relationship especially when undertaken as a specific and unique form of employment. The high degree of discretion necessary in caring for those who cannot care for themselves is common knowledge. The Ohio Supreme Court touched upon the notion that those employed to deliver care to others in need occupy a special relationship. *Massien*, 2010-Ohio-1864. We also acknowledged this special relationship in *State v. Sanders*, 12th Dist. Butler No. CA2003-12-311, 2004-Ohio-6320.

**Preliminary Background**

{¶ 42} During the state's recitation of facts, which Garrett agreed with, Garrett admitted that she was "in the victim's home, on duty as a caregiver employed by Visiting Angels at the time of the call from the co-defendant [and] immediately after the call [,] offered to take the victim to the bank and get the $4800." Garrett influenced the trustful victim to believe she was talking to her grandson when she was really talking to Garrett's boyfriend and accomplice.

{¶ 43} In the presentence-investigative report it was determined Garrett gave the victim's phone number to her boyfriend for purposes of calling the victim and pretending to be the victim's grandson. Garrett and her accomplice had concocted an illusion to convince the 105-year-old Alzheimer-stricken woman her grandson was having an emergency and needed a large amount of cash immediately. Garrett, as caregiver, routinely assisted her wards with banking activities so she offered to take the victim to the bank, escorting the

elderly woman to the teller for the purpose of getting $4,800 in cash. Due to the victim's trust and confidence in her relationship with Garrett, the victim fell further into the urgency of the ruse and followed Garrett's suggestion of Garrett taking the cash directly to the victim's grandson on her way home. Garrett knew the victim would be oblivious to the truth because of her extremely advanced age and impaired mental condition. Only from the advantage as caregiver could Garrett softly and gently guide the victim through the ignis fatuus Garrett had created.

{¶ 44} The trial court specifically made mention of the information available for its consideration and stated "[t]he court is also looking carefully at the facts of this case * * * [t]he court does also find that [Garrett] had a position of trust in this case, and that it was that position of trust that facilitated the events that are current." The family's impact statement makes reference to the fact that Garrett's role involved protecting their loved one.

{¶ 45} The record is replete with examples of the victim's trust and confidence placed in her caregiver. The victim relied upon Garrett for transportation, her in-home care, to monitor phone calls to help relay what was occurring, to tell the victim who she (the victim) was talking to, to take the victim banking, and to handle and deliver a large sum of cash to a relative, supposedly in a crisis. The step-by-step fiction created by Garrett was only believable because of the influence derived by Garrett from her special relationship with the victim.

{¶ 46} The record herein unquestionably demonstrates that Garrett could not have perpetrated her sham upon the victim but for victim's mental condition and the victim's reliance upon Garrett as her caregiver. Garrett's premeditated scheme would not have been believed by a person capable of perceiving and understanding reality. Garrett knew this weakness in the person she was hired to protect and took advantage of it. It is not an emotional appeal, simply fact, that the illusion cast upon the victim – the very nature of the

fraud itself – could not have taken place but for the victim's dependence upon, and trust in, her guardian, Garrett.

**Visiting Angels' Caregiver**

{¶ 47} In providing maintenance and care for a ward that has reached the extremely rare and delicate age of 105 and suffers some degree of Alzheimer's, the caregiver by necessity would oversee making constant decisions toward initiating protective attention and personal supervision to the person in her custody, care, and control. Commonsensically, the relationship is special in nature and contains unique and intimate personal responsibilities because the person in need cannot manage and provide for his or her own care.

{¶ 48} Caregiving involves the assistance of both the vital and confidential activities of assisted daily living (ADL). ADL activities involve a "multitude of instrumental activities, such as paying bills, shopping, and transportation." Ohio Elder Law Sec. 21.4 definition of caregiver (2018 Ed.). A "ward" is a person under the guard, protection, or supervision of another, which the record demonstrates was the relationship between Garrett, the ward's guardian, and Garrett's victim, the elderly 105-year-old woman with Alzheimer's. *See* definitions in *Webster's Third New International Dictionary* 2575 (1993); *Black's Law Dictionary* 9th Ed. (West Group, 2009).

{¶ 49} The majority expresses dislike for the use of the term "ward," noting that no legal guardianship was known to be in place. However, terms like "ward" and "guardian" are not reserved solely for probate proceedings. Similarly, the terms "fiduciary" or "professional" are not reserved only for those with high wages and the privilege of advanced education, as advanced by the majority. The majority seems to believe that one with lower wages or less education cannot assume the higher responsibilities of a "fiduciary relationship" or commit to sensitive and important duties. But a comprehensive reading of

*Massien* reveals that the amount of wages and degree of education does not dictate the existence of a "fiduciary relationship."

{¶ 50} *Massien* points out we must explore the very nature of the relationship. Beyond the existence of a special confidence and trust which involves fidelity to another, a "fiduciary relationship" results in a "position of superiority or influence, acquired by virtue of this special trust." *Massien*, 2010-Ohio-1864 at ¶ 35. It is important to understand *Massien*'s discussion in context of the circumstances. Applying the rationale in *Massien* in context does not "diminish" its holding as suggested by the majority, but rather, highlights its significance.

{¶ 51} The record clearly and convincingly supports a determination Garrett was hired to have fidelity to the victim and that her position was one of superiority or influence acquired by the victim's trust and confidence. While the family may not have thought in terms of hiring a "fiduciary," they surely thought they were hiring a dedicated and devoted in-home caregiver from a qualified agency. My disagreement with the majority centers around the notion that an in-home caregiver in a special relationship as it existed herein is simply a person with a "dubbed" title of little more importance than "technical competence." Nearly all people are capable of exercising fidelity depending upon the nature of the relationship in which they are involved.

{¶ 52} In the presentence-investigative report, the victim's family referenced the fact that Visiting Angels was hired to care for their loved one with special needs because it provided caregivers with a motto that promised to "protect elderly clients."[7] Obviously, within its common meaning, a caregiver for the elderly in need of care is a person responsible for the protection, maintenance, and well-being of such special wards. As

---

7. The majority most likely does not consider it a reasonable inference that a 105-year-old person inherently possesses the fragility that needs special care.

guardian for the person they are to protect, he or she is naturally expected to exercise the highest degree of discretion necessary to fulfill the responsibilities of a caregiver for the special needs of the weak and vulnerable, dependent persons incapable of caring for themselves. *State v. Sanders*, 12th Dist. Butler No. CA2003-12-311, 2004-Ohio-6320; *Massien*, 2018-Ohio-1864.

### *Massien*

{¶ 53} *Massien* involved the eligibility of a person for intervention in lieu of conviction (ILC). *Massien* did not discuss what needed to be in the record to support a trial court's finding a "position of trust" applies for sentencing purposes. *Massien* did not involve an in-home caregiver nor did it involve a ward or patient dependent upon a caregiver. The victim in *Massien* was not like the victim herein.

{¶ 54} The majority acknowledges that *Massien* considers a "position of trust" as a special relationship of trust and confidence undertaken for the benefit of another. Yet the majority refuses to permit the application of these very concepts to a frail, 105-year-old woman suffering from Alzheimer's experiencing the need to hire someone for in-home care and protection. The majority is compelled to interpret *Massien* as requiring a trial court to express details as to the degree of decision-making used by a caregiver, prior to determining that a "position of trust" applies. *Massien* simply did not require such.

{¶ 55} No such fact finding is required by R.C. 2929.13(B)(1)(b)(viii) before a trial court makes its finding. No such fact finding should be necessary where the victim is frail and vulnerable due to an extremely rare, advanced age also suffering a cognitive debilitating disease. Understanding the nature of the relationship makes it easy to comprehend why the victim was so easily influenced and "duped" by Garrett. The complexity of this relationship and its significance remains unaddressed by the majority.

{¶ 56} The victim was obviously dependent upon Garrett due to her role as a Visiting

Angels' in-home caregiver. Garrett, on the other hand, knew the person to whom she owed fidelity was ill, had mental impairment, and Garrett knew she had influence over that person; a person under her watch, oblivious to reality at times and easily misled.

{¶ 57} The discussion in *Massien* was to elucidate the significance of the fiduciary nature of a special relationship. *Massien* does not indicate that the same depth of detail is necessary in every set of circumstances. Common sense and reasonable inferences can be used by the trial court in determining the significance of a specially hired in-home caregiver's role in any particular case given the circumstances.

{¶ 58} *Massien* established no formula for finding a "position of trust" applies. The basis for a finding will be different on a case-by case basis. Although the majority gives great attention to the meaning of "fiduciary," *Massien* did not hold a "position of trust" only applies if a fiduciary relationship exists; the relationship need only be one of trust and confidence *equivalent to* a fiduciary relationship. A "fiduciary relationship" is one with trust between the agent and principal, requiring that care and responsibility be exercised for the best interest of the principal. *Black's Law Dictionary* 9th ed. (West Group, 2009). Clearly, the equivalency of such a relationship existed between Garrett as caregiver and the victim as a dependent person in need of protection and care.

{¶ 59} *Massien* is misapplied as suggesting a hired professional in-home caregiver in charge of the well-being for an elderly, fragile, 105-year-old woman with Alzheimer's was not in a special relationship of trust and confidence.[8] Garrett's role as a person dedicated to providing in-home care for this elderly person gave Garrett superiority or influence arising from that trust and confidence. This is the very definition of "fiduciary relationship" expressed in both *Massein* and *Black's Law Dictionary*.

---

8. The majority disapproves of Garrett being referenced as a "professional" providing special care for the elderly. Eliminating the word "professional," however, would not impact upon the analysis from *Massien.*

### *Sanders* – Our Precedent

**{¶ 60}** In *Sanders*, 2004-Ohio-6320, we upheld the defendant's sentence regarding her "position of trust" because she worked for a facility that oversaw providing maintenance and care to residents with mental disabilities. Sanders' victim had limited communication skills and was vulnerable as a special-needs resident. Sanders' presence at the facility in a position of caregiver placed her in the "position of trust" – a caregiver the residents were dependent upon due to their limitations in caring for themselves. On appeal, we determined the record supported the trial court's finding that Sanders occupied a position of trust because the facility that employed Sanders was supposed to provide care, comfort, and security to its residents who possessed limited abilities.

**{¶ 61}** "Whether [a defendant] held a position of trust and whether the offense related to that position of trust is largely a question of law." *State v. Gerasci*, 10th Dist. Franklin No. 04AP-26, 2004-Ohio-6128, ¶14, citing *State v. Bolin*, 12th Dist. Clermont No. CA97-06-056, 1998 Ohio App. LEXIS 17 (Jan. 12, 1998). The state rightfully relies upon *Sanders*, because there was no need for fact finding as to the details or for descriptions of Sanders' duties. The court sub judice made the same finding that the court in *Sanders* made, i.e., that the information before it supported a finding that a "position of trust" applied.

**{¶ 62}** The majority suggests that *Sanders* will no longer be followed because of the majority's interpretation and misapplication of *Massien.* Notably, the majority declines to overrule *Sanders*; however, it is clear if *Sanders* supports the trial court's finding a "position of trust" applies, then too, the information here supports the trial court's finding a "position of trust" applies. If the majority desires for *Sanders* to have no future "efficacy," it should

overrule *Sanders* so that the law in this district is clear.[9]

{¶ 63} Despite the majority's suggestion to the contrary, even post-*Massien*, this District would undoubtedly hold a hired caregiver of special needs residents with mental disabilities and impaired communication skills has a special relationship of a fiduciary nature. The relationship between a professional caregiver and the one in need is a relationship which holds trust and confidence equivalent to a "fiduciary relationship." Stare decisis requires that we adhere to our precedent, otherwise our authority as issued in our written opinions becomes meaningless. *Jones v. Walton*, 12th Dist. Butler No. CA87-09-117, 1987 Ohio App. LEXIS 9690 (Nov. 23, 1987) (acknowledging the importance of applying a fundamental principle of law, stare decisis).

## Conclusion

{¶ 64} The majority is within its authority to vacate the sentence and order proceedings accordingly, i.e. render a new sentence without the offending portion of the sentence. However, it is inappropriate to advise the parties they can submit entirely new information or testimony in mitigation or aggravation of the sentence. A completely new "do-over" hearing is ill-advised and equates to a special fact finding hearing. While I find the majority opinion unfortunate, I find an instruction for a "do-over" hearing equally unfortunate.[10]

{¶ 65} The majority's holding the record failed to support a finding that a "position of trust" applies becomes the law of the case. *State v. Clay*, 12 Dist. Madison No. CA2013-

---

9. A timely request from either party for en banc consideration of the issue pursuant to Loc.R. 18(B) may resolve the issue of *Sanders* as authoritative precedent; otherwise, the Twelfth District will maintain conflicting authority.

10. This is not the case where a trial court failed to consider a required finding and we remand so that the finding can be considered. Here the trial court made its finding. Yet, the majority draws its own inferences in a way that permits it to say that the trial court's finding is not logical and is otherwise not supported by the record. *See* ¶ 24 above.

04-013, 2013-Ohio-4984, *citing State v. Fisher*, 128 Ohio St.3d 92, 2010-Ohio-1165, ¶ 28. Similarly, fundamental fairness does not afford a party a second bite of the apple. *State ex. rel. Holdren v. Indus. Comm.*, 105 Ohio St. 3d 291, 2005-Ohio-1734, ¶ 18.

{¶ 66} The majority acknowledges that Garrett used her employment position as an in-home caregiver and premeditatedly preyed upon the vulnerable person she was hired to protect, yet the majority expresses little understanding or appreciation for the victim's age or mental condition due to Alzheimer's and the nature of the relationship that existed.[11] Real world, common awareness is cognizant of the mental and physical frailty of a person 105 years old.

{¶ 67} Similarly, one only hires, and pays for, an in-home caregiver from a professional agency when that person is unable to safely care and provide for him or herself.[12] The majority appears unaware of the special relationship that exists between a person who has survived over 100 years and the special person hired to provide for those special needs. The majority's perspective gives little importance to the family's efforts at hiring Visiting Angles to protect their loved one.

{¶ 68} Everyone knows that those suffering Alzheimer's need to be protected from themselves and others. Unfortunately, there was no one to protect the victim from her protector. Simply castigating the trial court's finding and the information relied upon within the record is insufficient to vacate the trial court's sentence. R.C. 2953.18(G)(2).

{¶ 69} The majority opinion inadvertently, yet inappropriately, denies the trial court the ability to use its common sense and reasonable inferences. Despite no statutory requirement, the majority desires unnecessary fact finding to support a "position of trust"

---

11. The majority appears displeased with not knowing the degree to which the victim suffered Alzheimer's; I find, as I think the trial court did, that such detail is of little significance.

12. The majority clings to an unknown significance that Garrett was only hired for a few hours at a time. However, the depth of the victim's purse has little significance upon the need for supervising a caregiver.

finding. *See* ¶ 11 above. It is impossible not to interpret the majority's opinion as requiring that a special hearing must take place, to factually develop the record. In this, I respectfully cannot join, and thus express my dissent.

{¶ 70} I would affirm Garrett's sentence as consistent with the law and supported by the record. Since there is information that supports the trial court's inferences, the trial court should be affirmed, even though the majority may choose to draw different inferences. The majority unintentionally circumscribes the standard of review found in R.C. 2953.08 (G)(2) designed to be "extremely deferential" to the trial court. *State v. Harp*, 12th Dist. Clermont No. CA2015-12-096, 2016-Ohio-4921, ¶ 7. Furthermore, the trial court did not abuse its statutory discretion in considering a prison term. The record supported the trial court's finding a "position of trust" applies for sentencing purposes and did not abuse its discretion in considering a prison term for Garrett.