[Cite as *State v. Rudolph*, 2023-Ohio-1040.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 111732 |
| v. | : | |
| JEREMY RUDOLPH, | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** March 30, 2023

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-21-661523-A

*Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Carl M. Felice, Assistant Prosecuting Attorney, *for appellee.*

Ashley Jones Law Firm, Ashley L. Jones and Leslie S. Johns, *for appellant.*

EILEEN A. GALLAGHER, J.:

{¶ 1} Defendant-appellant Jeremy Rudolph appeals his sentence after he pled guilty to two counts of grand theft. He contends that the trial court erred in

sentencing him to a prison term rather than community-control sanctions. For the reasons that follow, we affirm the trial court.

**Procedural History and Factual Background**

{¶ 2} On July 21, 2021, a Cuyahoga County Grand Jury indicted Rudolph on four counts of grand theft in violation of R.C. 2913.02(A)(3), a fourth-degree felony. The charges involved five victims — Travis Ferris, Peter and Adrian Pruitt, Dean Balbach and Abilene Alvarado. Rudolph initially pled not guilty to all charges.

{¶ 3} On May 9, 2022, the parties reached a plea agreement. Rudolph agreed to plead guilty to two amended counts[1] of grand theft in violation of R.C. 2913.02(A)(3), i.e., theft by deception, and to pay a total of $211,486.67 in restitution. In exchange for his guilty pleas, the remaining counts would be nolled.

{¶ 4} At the change-of-plea hearing, Investigator Patrick from the Ohio Department of Commerce Division of Securities (the "securities division") provided a brief overview of the facts that led to the charges against Rudolph. He explained that the securities division received information that Rudolph was "selling investments in a trading platform to individuals," that the victims gave money to Rudolph to invest in the trading platform, that Rudolph had promised the victims that they "would get a return back on the money" and that, instead of investing the funds, Rudolph placed the funds into his personal accounts and used them for his personal use.

---

[1] Count 1 was amended to include Balbach as an additional victim and Count 2 was amended to include Alvarado as an additional victim.

{¶ 5} During the plea colloquy, the trial court advised Rudolph regarding the constitutional rights he would be waiving by pleading guilty and further advised him that each of the counts to which he would be pleading guilty was "punishable by a separate six to 18-month prison sentence and a fine of up to $5,000." No objection was made to this advisement at the change-of-plea hearing. Rudolph indicated that he understood. The trial court also advised Rudolph that he would be ordered to pay restitution in accordance with the plea agreement, that if he were placed on probation, he could be ordered to pay a supervisory fee associated with his probation and that, if he were sentenced to prison, the parole board would have the discretion to place him on postrelease control for up to two years after he completed his prison terms. Once again, no objection was made to the reference to a possible prison sentence. Rudolph indicated that he understood.

{¶ 6} Rudolph entered his guilty pleas as agreed. The trial court found that Rudolph entered his guilty pleas knowingly, intelligently and voluntarily and accepted his pleas. The remaining counts were nolled. The assistant prosecuting attorney and Rudolph's counsel both indicated that they were satisfied that the trial court had complied with Crim.R. 11. The trial court then ordered a presentence-investigation report ("PSI").

{¶ 7} The PSI[2] included detailed information, provided by the securities division, regarding its investigation of the scheme that led to the charges against

---

[2] At the sentence hearing, Rudolph's counsel confirmed that she had read the PSI and found it to be "complete and accurate."

Rudolph. As reported in the PSI, the investigation revealed that Rudolph, through his sole member limited liability company, Haven Financial Enterprise, LLC ("Haven Financial"), sold investment contracts in Haven Financial's "trading leverage platform" that stated that investors would receive "10 times their investment in 37-40 banking days." Ferris, the Pruitts, Balbach and Alvarado provided funds to Haven Financial and/or Rudolph for investment. Instead of investing the funds, Rudolph deposited the "investment funds" received from Ferris, the Pruitts, Balbach and Alvarado into bank accounts under his control and used the majority of the "invested funds" to pay personal expenses. The securities issued by Rudolph through Haven Financial were not registered with the securities division for sale in, or from, Ohio. Rudolph had never held a securities salesperson license or an investment advisor representative license in Ohio.

{¶ 8} As reported in the PSI, the investigation also revealed that Rudolph told Ferris that he would help him obtain financing by applying for credit cards and loans in Ferris' name. He sent Ferris various documents explaining the trading platform and guaranteeing him an $80,000 profit on a $100,000 investment. Ferris took advances on his credit cards and made transfers to Haven Financial totaling approximately $47,400 for investment in the trading platform. Ferris stated that he never received any return on his investment and that although Rudolph was supposed to make payments on one of the credit cards Ferris had obtained to finance the "investments," Rudolph stopped making payments after making only two credit card payments.

**{¶ 9}** Adrian Pruitt told the securities division that Rudolph had helped the Pruitts obtain credit cards for their business then presented an investment opportunity, i.e., the trading platform, "promising a higher rate of return." She indicated that the Pruitts invested funds with Rudolph and, in exchange, Rudolph provided a "promissory note," providing for "75% interest" with $2,500 monthly payments until paid. She stated that the Pruitts received several payments from Rudolph but that Rudolph then stopped paying them and stopped responding to them.

**{¶ 10}** Balbach told the securities division that Rudolph informed him of an investment opportunity — which he understood to be an overseas investment — that would generate "substantial returns in a short period." Balbach stated that in exchange for his investment, Rudolph gave Balbach a promissory note that stated that his "investment value" was $100,000 and "guarantee[d]" a return of $250,000. He stated that he never received any return on his investment.

**{¶ 11}** Alvarado told the securities division that, on the advice of Rudolph, she obtained $50,000 in personal loans for investment with Rudolph through Haven Financial. She stated that Rudolph assured her that the investment would have a 30-45 day turnaround. Alvarado never received any payments from Rudolph.

**{¶ 12}** None of the victims received the "guaranteed" returns on their investments with Rudolph. Only the Pruitts were repaid the funds they had invested with Rudolph.

**{¶ 13}** On June 13, 2022, the trial court conducted a sentencing hearing. The state, Alvarado, Balbach, defense counsel and Rudolph spoke at the sentencing hearing.

**{¶ 14}** The state began by explaining the "scam" that led to the charges in the case as follows:

> Your Honor, a complaint came into the Department of Commerce's website and was forwarded to the Division of Securities to investigate.
>
> This complaint was from Ms. Alvarado, and it related to — it was related to an investment scheme in which she was scammed by the Defendant, Mr. Rudolph.
>
> And Investigator Patrick took a look at the complaint, and then began a long investigation. * * * And over about a year-and-a-half or two years they were able to uncover a scheme related to Mr. Rudolph.
>
> The scheme was being run through a company that he started, which is called Hayden [sic] Financial.
>
> And Hayden [sic] Financial, your Honor, was just a farce. It was just a company which preyed on victims that would have no idea that they were going to be scammed.
>
> What happened was, although it started out as one complaint, Investigator Patrick was able to uncover three additional victims of Mr. Rudolph's.
>
> And what he was telling them, Mr. Rudolph, was that he invests in trading platforms, and that he was going to guarantee money on their return. * * * [H]e says, if you were to invest $100,000 within 37 to 45 days, you're going to start seeing a return.
>
> And then, ultimately, there's going to be a guarantee of $80,000 in — in investment revenue, and up to $100,000 from your $100,000 investment.

What Investigator Patrick was able to do is look at all of the checks that came from all four of these victims into Mr. Rudolph's bank account.

And what he found was that there was no such program. There was no such investment.

Mr. Rudolph was completely living off of the money provided to him from all four of his victims.

He was convincing the victims to take out loans, to borrow against, you know, whatever they had in order to, you know, put this money into his trading platform. * * * So that was part of the whole pitch, as well. If you don't have the money, you can obtain it. And you can pay these loans back quickly that way. * * * He — it was just a big scam, is what he was running.

{¶ 15} The state indicated that Rudolph was not a registered investment advisor. The state further explained that, at Rudolph's urging, two of the victims, Alvarado and Balbach, had taken out loans to fund their investments with Rudolph and a third victim, Ferris, had used credit cards and a line of credit to fund his investments with Rudolph.

{¶ 16} At the hearing, Alvarado described how Rudolph convinced her to take out loans totaling approximately $50,000 to secure funds to invest in Rudolph's scheme. She stated that she never received any returns on her investments as promised by Rudolph and that, as a result of Rudolph's "premeditated" theft, she owed over $50,000 in loans she could not pay, had been sued for nonpayment of those loans and, due to the damage to her credit, was living with her parents and had been unable to secure financing to obtain a handicapped-accessible vehicle for her disabled son for five years.

{¶ 17} At the hearing, Balbach explained that he gave Rudolph over $118,000 for investment ($75,000 of which was obtained through loans), that he "lost the trust that [he] had" and that he suffered significant stress and health problems in addition to financial losses as a result of Rudolph's scam.

{¶ 18} Alvarado and Balbach also submitted written victim-impact statements to the trial court prior to the sentencing hearing that further described Rudolph's scam, the representations Rudolph made that led them to invest their funds with Rudolph and the financial, physical and emotional impact of Rudolph's scam on each of them.

{¶ 19} Defense counsel argued for the imposition of community-control sanctions, asserting that Rudolph had "genuine remorse" for his actions, had previously "lived a really law-abiding life," had "accepted responsibility" for his actions and "realize[d] the need * * * to pay restitution." She stated that although Rudolph was then unemployed, he had been looking for a job so he could start making payments towards the restitution he owed his victims. Rudolph apologized to the victims, stating that he "truly sympathize[d] with what they're dealing with and going through" and that he "would just like to make this right with the victims so they can move on with their life peacefully." Rudolph claimed that he had "several job offers on hold" pending the outcome of the case but, upon further questioning by the trial court, admitted that he had no written job offers.

{¶ 20} After considering the PSI,[3] the victim-impact statements, the statements made at the sentencing hearing and "the seriousness and recidivism factors and the purposes and principles of [the] sentencing statutes," the trial court sentenced Rudolph to 18 months in prison on each count, to be served concurrently. The trial court also ordered Rudolph to pay $45,989 in restitution to Alvarado, $118,097.67 in restitution to Balbach and $47,408 in restitution to Ferris.[4]

{¶ 21} In sentencing Rudolph, the trial court stated:

Mr. Rudolph, you are nothing short of a con. You created a platform, not a trading platform, but a platform of deceit here, deceit and pressure.

Not only did you steal money from Ms. Alvarado and Mr. Balbac[h] and Mr. F[e]rris, but you stole money that they didn't even have.

They took out loans to invest with you, and now Ms. Alvarado's left with a severely disabled son, and she can't even afford a vehicle to transport that son. * * * Again, the amount of economic harm caused to people who can't afford it is life changing. * * * So the injury caused, or suffered was both serious on an economic and physiological point of view, and maybe even so on a physical — from a physical standpoint, the amount of stress that people experience, eventually manifests itself in poor health.

{¶ 22} Rudolph raised no objection to his prison sentences at the sentencing hearing. On June 21, 2022, the trial court filed its sentencing journal entry in which

---

[3] At the sentencing hearing, Rudolph's counsel confirmed that she had read the PSI and that it was "complete and accurate."

[4] The Pruitts were not included in the restitution order because Rudolph paid back the funds invested by the Pruitts, making them whole.

it indicated that it had "considered all required factors of the law" when sentencing Rudolph and had found that "prison is consistent with the purpose of R.C. 2929.11."

{¶ 23} On July 5, 2022, Rudolph filed a motion for reconsideration, arguing that (1) House Bill 86 and R.C. 2929.13(B)(1)(a) required that Rudolph be sentenced to community-control sanctions rather than a prison term and (2) "in considering the purposes and principles of felony sentencing and R.C. 2929.13(B)(1)(a), a sentence of community control [was] warranted." Rudolph requested that the trial court "modify the sentence imposed in this case to impose a period of community control sanctions pursuant to R.C. 2929.13(B)(1)(a)." A week later, Rudolph filed a notice of appeal from the trial court's June 21, 2022 sentencing journal entry.

{¶ 24} On July 21, 2022, the trial court held a hearing on Rudolph's motion for reconsideration (the "reconsideration hearing"). At the reconsideration hearing, Rudolph argued that the trial court lacked authority to sentence Rudolph to a prison sentence under R.C. 2929.13(B)(1)(a) and that it was, therefore, "appropriate" for the trial court to resentence Rudolph to community-control sanctions. The state responded that the trial court had properly sentenced Rudolph to a prison term under R.C. 2929.13(B)(1)(b)(vii) because Rudolph held a "position of trust" and "created a fiduciary relationship" with his victims, i.e., the victims had trusted Rudolph to invest the money he was taking from them "into an actual investment fund." The state further argued that Rudolph's motion for reconsideration was a legal nullity, that the trial court lacked jurisdiction to consider its final judgment and that Rudolph's filing of a notice of appeal deprived the trial court of jurisdiction to

rule on Rudolph's motion for reconsideration. The trial court denied Rudolph's motion for reconsideration. Rudolph did not file a notice of appeal from that ruling or seek to amend its prior notice of appeal to include the trial court's denial of his motion for reconsideration.

{¶ 25} On appeal, Rudolph raises the following two assignments of error for review:

1. The trial court erred to the prejudice of appellant by imposing a prison term in violation of Ohio Revised Code § 2929.13(B)(1)(a).

2. The trial court erred in failing to consider mandatory sentencing factors under [R.C.] 2929.13(B)(1)(a) before sentencing and engaging judicial fact-finding to enhance a sentence in violation of Ohio Revised Code § 2953.08(G)(2), after sentencing.

{¶ 26} Rudolph's assignments of error are interrelated. Accordingly, we address them together.

**Law and Analysis**

**Imposition of Prison Sentence**

{¶ 27} In his first assignment of error, Rudolph argues that the trial court erred in sentencing him to prison instead of community-control sanctions under R.C. 2929.13(B)(1)(a). In his second assignment of error, Rudolph argues that his prison sentence is contrary to law and must be vacated because the trial court failed to "apply the statutory considerations" in R.C. 2929.13(B)(1) "before or (even during) sentencing" and failed to "acknowledge" at sentencing that "there was a statutory presumption of community control under [R.C.] 2929.13(B)(1)(a)." The

state responds that the trial court did not err in sentencing Rudolph to a prison term rather than community-control sanctions because Rudolph held a "position of trust" that "facilitated" the offenses at issue and the trial court, therefore, had discretion to sentence Rudolph to a prison term under R.C. 2929.13(B)(1)(b)(vii).

{¶ 28} We generally review felony sentences under the standard of review set forth in R.C. 2953.08(G)(2). *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 21. Pursuant to R.C. 2953.08(G)(2), an appellate court may increase, reduce or otherwise modify a sentence, or it may vacate a sentence and remand for resentencing, if it "clearly and convincingly finds" that (1) the record does not support the sentencing court's findings under R.C. 2929.13(B) or (D), 2929.14(B)(2)(e) or (C)(4) or 2929.20(I), "whichever, if any, is relevant," or (2) the sentence is "otherwise contrary to law." "'"Clear and convincing evidence is that measure or degree of proof * * * which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established."'" *State v. Gwynne*, Slip Opinion No. 2022-Ohio-4607, ¶ 19, quoting *State v. Marcum* at ¶ 22, quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

{¶ 29} In this case, however, Rudolph did not object to the trial court's advisements regarding a possible prison sentence at the change-of-plea hearing and did not object to the trial court's imposition of a prison sentence rather than placing

him under community-control sanctions at the sentencing hearing.[5] Because Rudolph did not object to his prison sentence at the sentencing hearing, he has forfeited all but plain error. *See, e.g., State v. Buckway*, 8th Dist. Cuyahoga No. 100591, 2014-Ohio-3715, ¶ 3 (where defendant failed to object to the trial court imposing a term of imprisonment rather than community-control sanctions at sentencing under R.C. 2929.13(B)(1), he forfeited all but plain error); *State v. Ali*, 10th Dist. Franklin Nos. 18AP-935, 18AP-936 and 18AP-938, 2019-Ohio-3864, ¶ 23 (where defendant did not object at the sentencing hearing to the trial court's imposition of a prison term rather than community-control sanctions for his crime of receiving stolen property, he forfeited all but plain error); *State v. Henslee*, 5th Dist. Muskingum No. CT2017-0009, 2017-Ohio-5786, ¶ 12 (where defendant failed to object, at his sentencing hearing, that the trial court had failed to make findings under R.C. 2929.13(B)(1)(b) before imposing a prison sentence for fourth- and fifth-degree felonies, he forfeited all but plain error); *State v. Ganguly*, 2015-Ohio-845, 29 N.E.3d 375, ¶ 38-40 (10th Dist.) (where defendant did not object to the imposition of a prison term at the sentencing hearing, appellate review was limited to plain error).

{¶ 30} Appellate courts have discretion to correct plain error. *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22. Plain error is an

---

[5] As stated above, Rudolph did not raise any objection to his prison sentence until his motion for reconsideration, filed more than three weeks after the sentencing hearing and two weeks after the trial court entered its sentencing journal entry. Because Rudolph's motion for reconsideration is a nullity, as explained below, that motion did not preserve the alleged sentencing error for appellate review.

obvious error or defect in the trial court proceedings that affects a substantial right. *Id.*; *see also* Crim.R. 52(B) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."). Plain error requires a showing that there was an error, i.e., a "'deviation from a legal rule,'" that the error was plain or obvious and that, but for the error, the outcome of the proceeding would have been otherwise, i.e., "a reasonable probability that the error resulted in prejudice." *Rogers* at ¶ 22-23, quoting *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002); *see also State v. Buttery*, 162 Ohio St.3d 10, 2020-Ohio-2998, 164 N.E.3d 294, ¶ 7, citing *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 16. Notice of plain error "is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. The party asserting plain error "bears the burden of proof to demonstrate plain error on the record." *Rogers* at ¶ 22, citing *Quarterman* at ¶ 16.

{¶ 31} Rudolph has not shown that the trial court committed error — much less plain error — here.

{¶ 32} R.C. 2929.13(B)(1)(a) creates a presumption in favor of community-control sanctions for nonviolent fourth- and fifth-degree felonies meeting certain criteria. *State v. Gates*, 8th Dist. Cuyahoga No. 108067, 2019-Ohio-4783, ¶ 7; *State v. Jones*, 8th Dist. Cuyahoga No. 107429, 2019-Ohio-1772, ¶ 13. It states:

Except as provided in division (B)(1)(b) of this section, if an offender is convicted of or pleads guilty to a felony of the fourth or fifth degree that is not an offense of violence or that is a qualifying assault offense, the court shall sentence the offender to a community control sanction or combination of community control sanctions if all of the following apply:

> (i) The offender previously has not been convicted of or pleaded guilty to a felony offense.

> (ii) The most serious charge against the offender at the time of sentencing is a felony of the fourth or fifth degree.

> (iii) The offender previously has not been convicted of or pleaded guilty to a misdemeanor offense of violence that the offender committed within two years prior to the offense for which sentence is being imposed.

{¶ 33} Rudolph argues that because he met the criteria in R.C. 2929.13(B)(1)(a), the presumption in favor of community-control sanctions applied, and the trial court was required to sentence him to community-control sanctions rather than to prison. We disagree.

{¶ 34} The parties do not dispute that the criteria set forth in R.C. 2929.13(B)(1)(a) were met in this case. However, R.C. 2929.13(B)(1)(a), by its terms, is subject to the exceptions listed in R.C. 2929.13(B)(1)(b). Under R.C. 2929.13(B)(1)(b), a trial court retains discretion to impose a prison term on a defendant who otherwise would be subject to mandatory community-control sanctions when certain conditions are met. R.C. 2929.13(B)(1)(b) provides, in relevant part:

The court has discretion to impose a prison term upon an offender who is convicted of or pleads guilty to a felony of the fourth or fifth degree

that is not an offense of violence or that is a qualifying assault offense if any of the following apply:

* * * (vii) The offender held a public office or position of trust, and the offense related to that office or position; the offender's position obliged the offender to prevent the offense or to bring those committing it to justice; or the offender's professional reputation or position facilitated the offense or was likely to influence the future conduct of others.

{¶ 35} "'R.C. 2929.13(B)(1)(b) does not require a trial court to enter a specific finding to the applicability of the section.'" *Jones*, 2019-Ohio-1772, at ¶ 16, quoting *State v. Dudley*, 5th Dist. Ashland No. 14-COA-015, 2014-Ohio-5419, ¶ 13; *see also State v. Faiola*, 7th Dist. Mahoning No. 21 MA 0094, 2022-Ohio-1126, ¶ 13 ("'[A] trial court is not required to make specific findings when imposing a prison sentence pursuant to R.C. 2929.13(B)(1)(b).'"), quoting *State v. Benson*, 7th Dist. Mahoning No. 18 MA 0042, 2019-Ohio-4635, ¶ 13, citing *State v. Floyd*, 7th Dist. Belmont No. 15 BE 61, 2017-Ohio-4278, ¶ 4-7 (affirming a prison sentence because the record established the defendant was on probation at the time of the offense, despite the trial court's failure to make specific findings at the sentencing hearing); *State v. Lewis*, 3d Dist. Marion No. 9-20-49, 2021-Ohio-1692, ¶ 16 ("[A] trial court is not required to make specific factual findings when imposing a prison sentence pursuant to R.C. 2929.13(B)(1)(b)."), citing *State v. Paxon*, 11th Dist. Trumbull No. 2019-T-0011, 2019-Ohio-3551, ¶ 18 ("[T]he statute does not require a court to explicitly make a finding before it has discretion to impose prison. Instead, a plain reading of the applicable version of R.C. 2929.13(B)(1)(b) confirms that if any of the factors apply, the court has discretion to impose a prison term. No explicit findings

are required."); *State v. Conley*, 1st Dist. Hamilton No. C-200144, 2021-Ohio-837, ¶ 22 (a trial court is not required to make findings before imposing a prison term under R.C. 2929.13(B)(1)(b)), citing *State v. Hamilton*, 1st Dist. Hamilton No. C-140290, 2015-Ohio-334, ¶ 8; *Henslee*, 2017-Ohio-5786, at ¶ 15 ("R.C. 2929.13(B)(1)(a) and (b) do not require the trial court to make specific findings.").

{¶ 36} In *State v. Massien*, 125 Ohio St.3d 204, 2010-Ohio-1864, 926 N.E.2d 1282, the Supreme Court of Ohio analyzed the "position of trust" factor in R.C. 2929.13(B)(1)(b)(vii). The court rejected an "unrestrained application of the phrase 'position of trust' to 'every breach of ethical, moral, or filial duty by a private individual,'" finding such an approach to be "[in]consistent with the sentencing principles set forth by the General Assembly," which, "as a whole[,] illustrate[d] that the General Assembly intended a narrow application of the phrase 'position of trust.'" (Citations omitted.) *Id*. at ¶ 21-22. The court held that "a private individual holds a 'position of trust' if he or she occupies a special relationship of trust and confidence equivalent to a fiduciary relationship." *Id*. at ¶ 41. The court further explained:

> "'A 'fiduciary relationship' is one in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust.'" *Stone v. Davis*, 66 Ohio St.2d [74,] 78, 419 N.E.2d 1094 [(1981)], quoting *In re Termination of Pratt*, 40 Ohio St.2d [107,] 115, 321 N.E.2d 603 [(1974)]. "A 'fiduciary' has been defined as "'a person having a duty, created by his undertaking, to act primarily for the benefit of another in matters connected with his undertaking.'"" (Emphasis sic.) *Strock v. Pressnell*, 38 Ohio St.3d 207, 216, 527 N.E.2d 1235 (1988), quoting *Haluka v. Baker*, 66 Ohio App. 308, 312, 34 N.E.2d 68 (1941), quoting 1 Restatement of the Law, Agency, Section

13, Comment a (1933). "A fiduciary relationship need not be created by contract; it may arise out of an informal relationship where both parties understand that a special trust or confidence has been reposed." *Stone*, 66 Ohio St.2d at 78.

*Id.* at ¶ 35.[6]  In *Massien*, the court considered whether a nurse who stole medicine occupied a "position of trust" relative to her employer, the hospital.  *Id.* at ¶ 3, 36-40.  The court noted that the record did not establish that Massien breached a duty of trust to any patient or that any patient was harmed as a result of her actions.  *Id.* at ¶ 36.  The court concluded that the relationship between the nurse and the hospital was merely an employee-employer relationship and that she did not "occup[y] a special relationship of trust and confidence equivalent to a fiduciary relationship" with the hospital.  *Id.* at ¶ 36-40, paragraphs two, three and four of the syllabus.

{¶ 37} In this case, by contrast, the record supports the conclusion that Rudolph had a relationship akin to that of a fiduciary with the victims in this case. The record shows that Rudolph held himself out to the victims as a legitimate financial investor, broker or advisor and took the victims' money with the understanding that Rudolph would be investing it for them and would get them a significant return on their investment.  The record further shows that, on the advice of, and at the urging of, Rudolph several of the victims took out loans to fund their

---

[6] Neither party has cited any case law addressing the application of the "position of trust" element in R.C. 2929.13(B)(1)(b)(vii) to facts similar to those here.  The only case Rudolph cites other than *Massien* on the issue, *State v. Garrett*, 12th Dist. Butler No. CA2018-03-048, 2019-Ohio-750, was overruled following en banc consideration.  *See State v. Garrett*, 2019-Ohio-2672, 140 N.E.3d 16 (12th Dist.).

"investments" with him. Clearly, these victims believed that in giving funds to Rudolph, he would be acting "primarily for [their] benefit" and trusted that he would make investments that were in their best interest and would earn them substantial returns as he had promised. *See id.* at ¶ 35.

{¶ 38} As set forth in the PSI, the statements at the sentencing hearing and in the victim-impact statements, the relationship between Rudolph and his victims was comparable to the relationship between a legitimate financial investor, broker or advisor and his or her clients. Although Rudolph knew his transactions with the victims were a scam, the victims did not. The victims believed they were giving their money — tens of thousands of dollars — to a legitimate financial investor, broker or advisor who would invest their money on their behalf and increase their wealth. In so doing, the victims reposed a "special confidence and trust" in the "integrity and fidelity" of Rudolph, by virtue of which Rudolph acquired a "position of superiority or influence" over his victims. *Id.* at ¶ 35; *cf. Ohio Div. of Secs. v. Treece*, 6th Dist. Lucas No. L-21-1191, 2022-Ohio-3267, ¶ 47 ("The relationship between a financial advisor and his or her clients is clearly fiduciary in nature."); *Hanick v. Ferrara*, 2020-Ohio-5019, 161 N.E.3d 1, ¶ 85 (7th Dist.) ("'A broker or financial advisor has a fiduciary relationship with his clients.'"), quoting *Lawarre v. Fifth Third Secs. Inc.*, 1st Dist. Hamilton No. C-110302, 2012-Ohio-4016, ¶ 13; *Mathias v. Rosser*, 10th Dist. Franklin No. 01AP-768, 2002-Ohio-2772, ¶ 18 (noting there is "general agreement that a broker or financial advisor is in a fiduciary relationship with his clients"). The record shows the victims would not have given their money to

Rudolph had they not believed he was a legitimate financial investor, broker or advisor, who would be investing their funds on their behalf as agreed. The crimes for which Rudolph was convicted related directly to Rudolph's position as a purported financial investor, broker or advisor and were facilitated by Rudolph's position as a purported financial investor, broker or advisor. As detailed above, the record reflects that the trial court specifically considered Rudolph's conduct and the manner in which he utilized his position and the trust his victims had reposed in Rudolph when sentencing him, noting that he had created "not a trading platform, but a platform of deceit here, deceit and pressure."

{¶ 39} Although the trial court did not make any specific findings under R.C. 2929.13(B)(1)(b) prior to sentencing Rudolph to prison in this case, it was not required to do so. The record was sufficient to conclude that Rudolph held a "position of trust" that "facilitated" the offenses at issue, i.e., the victims reposed "confidence and trust" "in the integrity and fidelity of [Rudolph]," that he thereby acquired "a resulting position of superiority or influence" over the victims and that he used that trust and influence to defraud the victims. *Massien*, 125 Ohio St.3d 204, 2010-Ohio-1864, 926 N.E.2d 1282, at ¶ 35, 41; *cf. State v. Betts*, 10th Dist. Franklin No. 19AP-226, 2020-Ohio-4891, ¶ 15-16, 23 (record supported determination that defendant nurse, an independent provider who was permitted to bill the Ohio Department of Medicaid directly, abused her "position of trust" when she fraudulently billed for services she never provided and could, therefore, be sentenced to prison time pursuant to R.C. 2929.13(B)(1)(b)(vii)); *Garrett*, 2019-

Ohio-2672, 140 N.E.3d 16, at ¶ 25-31 (record supported trial court's finding that defendant held a position of trust that facilitated telecommunications fraud and theft offenses pursuant to R.C. 2929.13(B)(1)(b)(vii) where defendant used her position as caretaker to defraud elderly victim into giving her $4,800, believing money would be used to help victim's grandson); *State v. Courtney*, 2d Dist. Clark No. 2013-CA-73, 2014-Ohio-1659, ¶ 23-24 (trial court did not err in sentencing defendant to a prison term rather than community-control sanctions; record supported determination that defendant held a "position of trust" under former R.C. 2929.13(B)(1)(b)(viii) that facilitated her theft from employer where defendant was an office manager of a used car dealer, had worked for the company for 20 years, was in charge of customer accounts, used software to track the company's accounts and expenses and handled large sums of money on behalf of her employer).

{¶ 40} Because the application of R.C. 2929.13(B)(1)(b)(vii) was supported by the record, the trial court had discretion to impose a term of imprisonment rather than community-control sanctions. *See, e.g., Jones*, 2019-Ohio-1772, at ¶ 17. Accordingly, Rudolph has not shown that the trial court erred — much less committed plain error — in sentencing him to a prison sentence rather than community-control sanctions.

**Motion for Reconsideration**

{¶ 41} In his second assignment of error, Rudolph contends that the transcript from the reconsideration hearing shows that "the provisions of [R.C.] 2929.13(B)(1)(a) were not a factor" in the trial court's sentencing of Rudolph and

that the trial court improperly "engaged in after-sentencing judicial fact-finding to conclude that [R]udolph breached a fiduciary duty" when denying Rudolph's motion for reconsideration. Rudolph's arguments are meritless.

{¶ 42} It is well established that a trial court cannot reconsider a valid final judgment in a criminal case. *See, e.g., State v. Raber*, 134 Ohio St.3d 350, 2012-Ohio-5636, 982 N.E.2d 684, ¶ 20 ("'[T]rial courts lack authority to reconsider their own valid final judgments in criminal cases.'"), quoting *State ex rel. White v. Junkin*, 80 Ohio St.3d 335, 338, 686 N.E.2d 267 (1997). Because the trial court lacks jurisdiction to reconsider its own valid final judgments, a motion to reconsider a sentence that is filed after the entry of a valid final judgment is a legal nullity, and any purported judgment or order from such a motion for reconsideration is also a legal nullity. *See, e.g., State v. Moon*, 8th Dist. Cuyahoga No. 93673, 2010-Ohio-4483, ¶ 19; *State v. Dix*, 8th Dist. Cuyahoga No. 101007, 2014-Ohio-3330, ¶ 3, citing *Pitts v. Ohio Dept. of Transp.*, 67 Ohio St.2d 378, 379, 381, 423 N.E.2d 1105 (1981).

{¶ 43} There is no dispute in this case that the trial court's June 21, 2022 sentencing journal entry was a valid final judgment. As such, Rudolph's motion for reconsideration was a legal nullity. Likewise, the trial court's reconsideration hearing and order denying Rudolph's motion for reconsideration were nullities.[7]

---

[7] As noted above, Rudolph did not appeal the trial court's denial of his motion for reconsideration or seek to amend his prior notice of appeal to include the trial court's July 21, 2022 order denying his motion for reconsideration. Nevertheless, because his motion for reconsideration was a nullity, the trial court's order denying Rudolph's motion for reconsideration was not subject to appeal. *See, e.g., Dix* at ¶ 2-4; *State v. Rivkind*, 11th Dist. Portage No. 2023-P-0004, 2023-Ohio-514, ¶ 2-4.

{¶ 44} Furthermore, the timely filing of a notice of appeal deprives a trial court of jurisdiction over matters that are inconsistent with the appellate court's jurisdiction to affirm, modify or reverse the judgment being appealed. *See, e.g., State ex rel. Electronic Classroom of Tomorrow v. Cuyahoga Cty. Court of Common Pleas*, 129 Ohio St.3d 30, 2011-Ohio-626, 950 N.E.2d 149, ¶ 13; *see also State v. Washington*, 137 Ohio St.3d 427, 2013-Ohio-4982, 999 N.E.2d 661, ¶ 8 ("'An appeal is perfected upon the filing of a written notice of appeal. * * * Once a case has been appealed, the trial court loses jurisdiction except to take action in aid of the appeal.'"), quoting *In re S.J.*, 106 Ohio St.3d 11, 2005-Ohio-3215, 829 N.E.2d 1207, ¶ 9; *State v. McDonald*, 8th Dist. Cuyahoga No. 111724, 2023-Ohio-464, ¶ 15-16 ("[T]he timely filing of a notice of appeal precludes a trial court from issuing further orders affecting matters at issue in the appeal. Where a trial court enters an order without jurisdiction, its order is void and a nullity."), citing *State v. Williamson*, 8th Dist. Cuyahoga Nos. 100563 and 101115, 2014-Ohio-3909, ¶ 18. Rudolph filed his notice of appeal, timely appealing his judgment of conviction, before the reconsideration hearing and before the trial court ruled on his motion for reconsideration.

{¶ 45} Accordingly, we do not consider Rudolph's motion for reconsideration, the reconsideration hearing or the trial court's order denying his motion for reconsideration here.

{¶ 46} Rudolph's first and second assignments of error are overruled.

{¶ 47} Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, JUDGE

FRANK DANIEL CELEBREZZE, III, P.J., and
EMANUELLA D. GROVES, J., CONCUR